16749

WARD v. DIXIE SHIRT CO., INC., *ET AL.*
(76 S. E. (2d) 605)

450

*Messrs. Haynsworth & Haynsworth* of Greenville, *for Appellant,*

*Messrs. Poliakoff & Poliakoff,* of Spartanburg, *for Respondent,*

June 2, 1953.

OXNER, Justice.

This is a workmen's compensation case. It is conceded that the claimant, Mrs. Mary E. Ward, sustained an injury arising out of and in the course of her employment. The principal questions presented are (1) whether her right to compensation should be suspended on account of her refusal to undergo a myelogram test by a Spartanburg physician selected by the employer and its insurer, and (2)

whether the Industrial Commission erred in ordering an examination of claimant by two physicians of Atlanta, Ga.

Claimant is a middle-aged white woman. About twenty-five years ago she sustained an injury to her left knee which ordinarily would have healed without difficulty, but poor circulation developed which, according to the medical testimony, "progressed to the state she got complete absence of circulation and so-called dry gangrene on the leg, eventually necessitating the amputation of that leg midway between the hip and knee." Thereafter she walked with the aid of crutches. In 1942 or 1943, she secured employment with appellant Dixie Shirt Company, Inc. In 1950 she fell and fractured a vertebrae in her back, from which there was a good recovery. On October 23, 1950, while walking across the floor with a load of cloth bundles, she slipped on an apple peeling and fell, injuring her back and right leg. She was placed by her employer in the care of Dr. Sam O. Black, Jr. of Spartanburg, who described her injury and the treatment administered as follows:

"She was admitted to the hospital with such severe pain that I first suspected severe damage to the bones of the spine and was quite surprised to see that her old fracture had completely healed. There was no bony injury but she had severe muscle spasm and muscle sprain. While in the hospital she began to show signs in her right leg which were identical with her trouble twenty-five years before, a peripheral vascular disease; so that a novacain injection stopped this spasm and in the course of four or five minutes her leg warmed up and the circulation improved.

"She was discharged from the hospital on November 23, 1950, but was readmitted two days later with the same changes in her leg, to such extent that the foot was cold and blue, and severe pain accompanied the process. The following day, therefore, the sympathetic nerves were removed— a lumbar sympathectomy done. This is a relatively simple operation in the field of general surgery. I guess they do more than neurosurgeons. She had no more symptoms of the peripheral vascular trouble.

"During the course of her hospitalization, Mrs. Ward had to have repeated injections for pain, and so forth; and she developed, in the tissue beneath the skin, large fibrous nodules, which are typical of foreign body reaction. Some people develop these things and some people don't. Usually, these fibrous nodules, they seem to cause very little difficulty and subside in size, pain and so forth. In Mrs. Ward's case, these fibrous nodules became quite large. She got diffused fibrous tissue reaction beneath the skin in her right hip and thigh, and also where she had injections in her arms. The pain from these was such that it was necessary to remove them.

"Now, during this time Mrs. Ward began to show progressively severe pain in her right leg, pain radiating down to the knee and to the ankle; and it was difficult to determine how much of this pain was due to the fibrous reaction and how much was due to her peripheral vascular disease; or whether or not she had developed, as a result of her fall, a rupture or protrusion of one of the intervertebral discs."

Dr. Black had claimant examined by Dr. Coleman, an orthopedic surgeon, after which he was still undecided as to whether or not claimant had a ruptured intervertebral disc. Dr. Black further testified:

"We proceeded to treat Mrs. Ward with physiotherapy to her knee and leg and she showed progressive improvement in the use of the knee and in the strength of the knee itself. She continued to have this radicular pain in her right leg; and because of the question of the intervertebral disc, because of the fibrous tissue reaction which she developed so very markedly, and because of the ease of which she bruised in all areas on slight trauma, I requested Dr. Coker, as a diagnostician or internist, to see her in consultation. After she saw Dr. Coker, whose complete examination is here, I became more than ever convinced that she may well have a ruptured intervertebral disc.

"There was one other thing about her case that I think is important and that is, with only one leg it is much more

difficult to evaluate the opposite leg; because Mrs. Ward has had to wear an artificial limb held in place with straps about her waist and across her shoulders. So, actually, that's the only support and the motion comes from swinging that limb with her back, body, and shoulders. So, a person with two legs damaged—one can get along much better than a person with one leg, because it's that leg and her shoulders that she actually did walk with. So, I then advised Mrs. Ward that I thought she needed most expert neurosurgical opinion. She was willing to see anyone. I suggested Dr. Edward Fincher, Professor of Neurosurgery at Emory, and also be seen there by Dr. Paul Reith, who is Associate Professor of Orthopedic·Surgery; and I particularly wanted Dr. Reith to see her because of his outstanding work in disabilities of the low back, particularly ruptured discs, intervertebral discs, and low back instabilities. Dr. Reith's work in rehabilitating people who have had two, three or five operations is becoming quite known over the country. At the present time, the type of operative procedure Dr. Reith does is being done no where else. There are similar operations, but none that follows his technique."

\* \* \* \* \*

"I requested this examination of the insurance company, including the myelogram and, if necessary, an operation; and if in their opinion no operation was necessary, I advised no operation. Mrs. Ward was willing to go to Atlanta for any procedure necessary to help her get well."

The Insurance Company refused to agree to an examination of claimant by the Atlanta physicians and instead requested that she be examined by Dr. Hodge, a neurosurgeon of Spartanburg. She was examined by Dr. Hodge on August 6, 1951, who concluded that a specific diagnosis could not be made "without additional studies, such as X-rays of the lumbosacral spine and a spinal myelogram." This was reported to the Insurance Company. On September 4, 1951, the insurance adjuster notified claimant that arrangements had been made for her to be admitted to a Spartanburg hos-

pital on September 10, 1951, in order that she might undergo a myelogram examination by Dr. Hodge. Claimant's husband reported this request to Dr. Black, who testified:

"I advised him not to do so, because I was still, at that time, anticipating examination of her by Dr. Reith and Dr. Fincher. As a myelogram is part of an examination that should be carried out by the operating surgeon, I could see no reason for one myelogram to be done in Spartanburg and Atlanta to have another done, because I was definitely of the opinion at that time, and still am, that a case as complicated as Mrs. Ward's should be handled by people who have had wide experience in that particular field and whose judgment in these cases is beyond any question; and for that reason I advised them not to have a myelogram done here. He asked my advice and I gave it."

Claimant had been paid temporary total disability from the date of her injury to September 11, 1951. After her refusal to report to the hospital for a myelogram test by Dr. Hodge, the Insurance Company obtained from the Industrial Commission permission to stop compensation payments until such time as claimant reported to Dr. Hodge. On March 11, 1952, a hearing was had before Commissioner Reid on the question of whether the claimant's refusal to report to Dr. Hodge was justified. At this hearing both Dr. Black and Dr. Hodge testified. On April 25, 1952, an opinion was filed by Commissioner Reid in which he found that claimant was justified in refusing to undergo a spinal myelogram test by Dr. Hodge and that the disability payments should be resumed retroactive to September 11, 1951. The Commissioner further ordered the employer and its insurance carrier to defray the cost of an examination of claimant by Drs. Fencher and Reith of Atlanta, Georgia. On June 27, 1952, the opinion and award of Commissioner Reid was affirmed by the full Commission, which was sustained by the Circuit Court in an order filed on January 20, 1953. The employer and its insurance carrier have appealed.

We shall first determine whether claimant was justified in refusing to undergo a myelogram test by Dr. Hodge. The statute, Section 72-307 of the 1952 Code, provides:

"After an injury and so long as he claims compensation, the employee, if so requested by his employer or ordered by the Commission, shall submit himself to examination, at reasonable times and places, by a duly qualified physician or surgeon designated and paid by the employer or the Commission. * * * If the employee refuses to submit himself to or in any way obstructs such examination requested by and provided for by the employer, his right to compensation and his right to take or prosecute any proceedings under this Title shall be suspended until such refusal or objection ceases and no compensation shall at any time be payable for the period of suspension unless in the opinion of the Commission the circumstances justify the refusal or obstruction."

It will be noted that if an employee fails to comply with the foregoing requirement, his employer may stop compensation payments "unless in the opinion of the Commission the circumstances justify the refusal." Where the facts are disputed and are subject to more than one reasonable inference as to whether the employee is justified in refusing to submit to an examination requested by his employer, the conclusion of the Industrial Commission thereabout is final. But where the circumstances warrant only one reasonable inference, the question becomes one of law rather than of fact and the decision of the Industrial Commission is subject to review. *Hill v. Skinner,* 195 S. C. 330, 11 S. E. (2d) 386. It was there held that the requirement of the statute was mandatory and that under the facts of that case, the conclusion of the Commission that the employee was justified in refusing to submit to an examination was without evidentiary support and should be reversed.

Applying the foregoing rule to the facts of the instant case, is there any reasonable basis for the conclusion of the Industrial Commission that the claimant was justified in

refusing to undergo a myelogram test by Dr. Hodge? On the question of the danger attendant upon such test, Dr. Black testified:

"Q. The myelogram is, or is not, a painful sort of thing? A. Yes, there is a certain amount of pain attached to it. I have had three; and I made the statement the last time that I would have an operation before I would have a myelogram.

"Q. Is it very painful? A. Not very, I wouldn't say. It is certainly worth while as a diagnostic procedure.

"Q. Doctor, is it necessary to insert fluid into the spine? A. Into the spinal canal.

"Q. Is there some danger attendant with inserting that fluid into the spinal canal? A. Yes; danger has been reported, but it is very minimal.

"Q. What is the danger involved? A. The danger, other than routine danger of any surgical procedure such as infection, the danger is of developing arachnoiditis. I can explain that. The arachnoid is one of the layers that covers the spinal cord and the brain; and arachnoiditis is inflammation of this layer, localized to the point of the injection of the dye, in this instance produces both pain in the area and along the course of all the nerves which pass through the arachnoid where it is involved."

With reference to this phase of the case, Dr. Hodge testified as follows:

"Q. Is there attendant danger to a spinal myelogram operation? A. There are some dangers. The dangers are not attendant to the procedure itself. The material we use, pantopaque, is relatively inert and I have no untoward reaction to the use of pantopaque. In some occasional cases, where they have an idiosyncracy to the drug, like reaction to aspirin, they get high fever and pain, but it is not inherent in the procedure itself. In my experience I have never encountered it, but it has been reported to occur.

"Q. It is painful, isn't it? A. If they have a reaction they have pain, fever and a headache."

Dr. Black was of the opinion that while any surgeon is qualified to give a myelogram test, it should be done by the neurosurgeon who is going to perform the operation, if one is found necessary. Dr. Hodge seems to be substantially of the same opinion as shown by the following taken from his testimony:

"Q. If you were going to have an operation on your back, would you have Dr. Fincher perform it? A. No, I wouldn't. There are only two men I would let operate on my back —the two men I trained under Dr. Woodhall or Dr. Odom (neurosurgeons at Duke University).

"Q. Those are the only two? A. Those are the only two.

"Q. Would you have a spinal myelogram on your back? A. If it became necessary, but I would let Dr. Woodhall or Dr. Odom perform it.

"Q. You would consult a long time before you would? A. If there was some indication for me I would have it, but I wouldn't have it just for the fun of it."

We think the facts in this case reasonably warrant the conclusion of the Industrial Commission that claimant was justified in refusing to submit to a myelogram test at the hands of Dr. Hodge. Here we have an employee whose physical condition and medical history are such as to require unusual care and caution. For this reason, Dr. Black, to whom claimant was referred by her employer, was definitely of the opinion that she should be examined by the Atlanta physicians who should give the test and perform the operation, if one was necessary. He concluded that she should not be subjected to an additional myelogram test by Dr. Hodge. Is claimant to be penalized by having her right to compensation suspended on account of following in good faith the advice of an outstanding physician selected by her employer? It must be kept in mind that claimant has not refused to undergo a myelogram test. She is entirely agreeable to having such test made by the Atlanta physicians. The fact that such may be advisable under the peculiar circumstances of this case is no reflection on Dr. Hodge who was

permitted to make a general examination of claimant. While a myelogram test may not be attended with unusual danger, the testimony shows that it cannot be classified as a routine matter and undoubtedly is attendant with some risk. The Industrial Commission may have concluded that the rights of the employer and insurer would be fully protected if only one test was made and that because of claimant's condition it should be made by the Atlanta physicians.

Appellants claim that the question before us is controlled by *Wardlaw v. J. G. Ridgeway Construction Co.,* 212 S. C. 116, 46 S. E. (2d) 662, 663. We do not think so. It is readily distinguishable on the facts. In that case an uneducated employee refused to allow a spinal puncture because he was afraid "to be worked on in the spinal part anywhere at all." His excuse for such refusal was that he knew of people who had been disabled and of one who had died as a result of a "spinal shot." Neither the employer nor employee offered any medical testimony, the absence of which added to our difficulties. We held that the foregoing circumstances were insufficient as a matter of law to justify the employee in his refusal to permit a spinal puncture. In the instant case, the employee does not refuse to submit to a myelogram test. She is only asking that one such test be made and that by the Atlanta physicians, and claimant has offered medical testimony, which was not done in the *Wardlaw case,* to justify the position she has taken. It should be added that it is not clear whether our characterization of the requested spinal puncture in the Wardlaw case as a "myelogram test" is entirely accurate. In writing the opinion, as has been noted, we were entirely without the benefit of medical testimony. If the test proposed in the *Wardlaw case* involved solely the extraction of spinal fluid, it could hardly be said to embody all the features of a myelogram test as described in the testimony now before us.

Of interest is the decision of the Supreme Court of Rhode Island in the case of *Cranston Print Works v. Pascatore,* 72 R. I. 471, 53 A. (2d) 452, 456, where the Court concluded

from the evidence presented that a myelogram test "was not without considerable risk to the patient's bodily health," and was not within the contemplation of the term "examination" as used in a provision of a compensation act requiring claimant to submit to examination upon an employer's request. It should be added that the question last mentioned is not involved in the instant case and we intimate no opinion thereabout.

The next question is whether the Commission was empowered to order an examination of claimant by non-resident physicians. It is stated in appellants' brief: "The statute merely allows the Commission to send the claimant to a doctor, but the statute cannot be extraterritorial in nature and could only embrace the jurisdiction of the State of South Carolina." It is contended that there are competent neurosurgeons in South Carolina and to send claimant to Atlanta, Georgia, for examination adds unnecessarily to the liability of appellants for medical expenses and that the Atlanta physicians could not be compelled to attend court in South Carolina. These certainly constitute very cogent reasons why ordinarily claimants should be examined by South Carolina physicians. But we find nothing in the Workmen's Compensation Act restricting the Commission to the selection of South Carolina physicians. We would not be warranted in holding that under no circumstances may physicians from other states be used in workmen's compensation cases. The argument is made that if the Commission may send a claimant to Atlanta, it could send them to distant points and thereby impose an undue hardship on insurance carriers. But if the Commission should abuse its discretion in this respect, such abuse is subject to correction by the courts. It is sufficient to say in the instant case that under all the circumstances we find no abuse of discretion.

The next exception which we shall consider is that the Court below erred "in affirming the award of the Commission in that the award of the Commission was based on matters not included in the record and not

introduced in evidence." This exception might well be disposed of by stating that it is entirely too general. However, it cannot be sustained when considered on the merits. In the opinion of the hearing Commissioner, he relates dangers inherent in a myelogram test which he learned from lectures and papers by medical experts at various conferences attended by him and also quotes at length from a medical textbook, none of which was offered in evidence. Appellants claim that the consideration of this information by the hearing Commissioner constitutes reversible error in that the opinion of the Commissioner was based on evidence of experts who were not cross-examined, and further contend that they had no opportunity of offering evidence in reply. It must be conceded that the papers and textbook were not properly before the Commissioner. However, a rather careful reading of the opinion rendered by the hearing Commissioner shows that his conclusion was reached on the evidence before him and independently of this outside information, and that these authorities were merely referred to in support of his conclusion. But be that as it may, the papers and textbook complained of are not referred to in the opinion of the full Commission, and we have no right to assume that the unanimous opinion of that body was influenced by the matters mentioned.

The final exception is that the Court below erred in requiring appellants to pay compensation beyond March 11, 1952, the date of the hearing before the single Commissioner. The order of the Circuit Court directed that appellants pay temporary total disability to claimant "from the date of the discontinuance of the payments on September 11, 1951, until the date of the petition on December 11, 1952." The last mentioned date is the date on which the Circuit Court ruled appellants to show cause why immediate payment should not be made of all temporary disability from September 11, 1951, to date. It is claimed that in requiring appellants to pay temporary total disability beyond the date on which the hearing was had before the

single Commissioner, the Court invaded the province of the Industrial Commission.

Dr. Black testified that claimant was "100% disabled" to work. The hearing Commissioner so found and stated that claimant's "condition was such as to warrant the conclusion that she would remain totally disabled indefinitely." In the award of the hearing Commissioner it is stated that appellants shall pay claimant compensation from September 11, 1951, to March 11, 1952, and "from March 11, 1952 until such time she has fully recovered or has reached maximum of improvement, able to return to some gainful employment or with some permanent disability to be determined by the Industrial Commission, and that the compensation shall not be terminated without prior approval of the Industrial Commission." The opinion of the single Commissioner was affirmed in all respects by the full Commission. In the appeal of the appellants to the Circuit Court, no exception was taken to the portion of the award which has been quoted. We agree with the Circuit Court that this award contemplates that compensation "should be continued until such time as the Commission determines otherwise, which the Commission has not done in this case." Under these circumstances, there was no error in requiring appellants to pay compensation through December 11, 1952.

All exceptions are overruled and the order of the Circuit Court is affirmed.

BAKER, C. J., and FISHBURNE, STUKES and TAYLOR, JJ., concur.